*SEC v. Govil*

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2022
No. 22-1658

SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee,*

v.

ARON GOVIL,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: JUNE 5, 2023
DECIDED: OCTOBER 31, 2023

---

Before: CHIN and MENASHI, *Circuit Judges,* and KOMITEE, *Judge.*[*]

Defendant-Appellant Aron Govil engaged in several fraudulent securities offerings through his company, Cemtrex. Pursuant to a settlement agreement with Cemtrex, Govil agreed to

---

[*] Judge Eric R. Komitee of the United States District Court for the Eastern District of New York, sitting by designation.

pay back the proceeds of his fraud in part by surrendering his Cemtrex securities to the company. The district court later granted a motion by the SEC for additional disgorgement. The district court concluded that disgorgement was authorized and that the value of the securities Govil surrendered to Cemtrex should not offset the disgorgement award. Govil argues that neither 15 U.S.C. § 78u(d)(5) nor 15 U.S.C. § 78u(d)(7) authorize disgorgement here. We agree. Our court recently held that the disgorgement remedies under § 78u(d)(5) and § 78u(d)(7) are subject to the "traditional equitable limitations" that the Supreme Court recognized in *Liu v. SEC*, 140 S. Ct. 1936 (2020). *SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023). One of those equitable limitations is that disgorgement must be "awarded for victims." *Liu*, 140 S. Ct. at 1940. A defrauded investor is not a "victim" for equitable purposes if he suffers no pecuniary harm. Because the district court did not find that the investors in this case suffered such harm, the district court abused its discretion when it concluded that disgorgement was authorized. We vacate the judgment of the district court and remand with instructions to determine whether the defrauded investors suffered pecuniary harm.

Additionally, Govil argues that the district court erred in disregarding the surrendered securities. Again, we agree. A wrongdoer makes a payment in satisfaction of a disgorgement remedy when he returns property to a wronged party. Accordingly, if on remand the district court decides that disgorgement is authorized, it must value the surrendered securities and credit that value against the overall disgorgement award.

2

KERRY J. DINGLE, Senior Appellate Counsel (Michael A. Conley, Solicitor, *on the brief*), Securities and Exchange Commission, Washington, DC, *for Plaintiff-Appellee*.

MATTHEW AARON FORD (Adam C. Ford, Stephen R. Halpin III, *on the brief*), Ford O'Brien Landy LLP, New York, NY, *for Defendant-Appellant*.

MENASHI, *Circuit Judge*:

More than twenty years ago, Defendant-Appellant Aron Govil founded Cemtrex, Inc. ("Cemtrex" or the "Company"). He eventually took Cemtrex public and saw its common shares listed on the NASDAQ. In 2016 and 2017, however, Govil caused Cemtrex to engage in three fraudulent securities offerings. In those offerings, Govil represented to investors that the Company would use the proceeds from the transactions to satisfy outstanding debts and for general corporate purposes. Instead, he diverted over $7.3 million of the offering proceeds to his own private accounts.

The SEC quickly caught on. In advance of an enforcement action, Govil entered into two agreements—one with the SEC (the "Consent Agreement") and one with Cemtrex (the "Settlement"). In the Consent Agreement, Govil agreed broadly not to challenge the SEC's civil enforcement action. The Consent Agreement left unresolved whether there would be a disgorgement award relating to the three fraudulent Cemtrex offerings. In the Settlement, Govil agreed to surrender all Cemtrex securities in his control and to pay the Company over $1.5 million in the form of a secured promissory note. In exchange, Cemtrex released all private claims against Govil.

3

After filing its complaint and securing a partial judgment consistent with the Consent Agreement, the SEC moved for additional disgorgement of approximately $7.3 million. Govil opposed the motion, but the district court decided that disgorgement was available. It credited the $1.5 million due under the secured promissory note as a payment in satisfaction of disgorgement, but it disregarded the securities that Govil surrendered to Cemtrex. The district court ordered Govil to pay additional disgorgement of approximately $5.8 million.

Govil raises two principal arguments on appeal. First, he contends that disgorgement was not authorized under 15 U.S.C. § 78u(d)(5) or 15 U.S.C. § 78u(d)(7). We agree. Our court recently held in *SEC v. Ahmed* that the disgorgement remedies available under § 78u(d)(5) and § 78u(d)(7) are limited by equitable principles. *See SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023) ("[W]e conclude that disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu [v. SEC*, 140 S. Ct. 1936 (2020)]."). One of the equitable limitations identified in *Liu* is that disgorgement must be "awarded for victims." *Liu*, 140 S. Ct. at 1940. Because a defrauded investor is not a "victim" for equitable purposes if he suffered no pecuniary harm, the district court needed to determine that the investors Govil defrauded suffered pecuniary harm before awarding disgorgement. Even though *Ahmed* was decided after the district court ruled in this case, the district court abused its discretion in making the award without that predicate determination.[1] Accordingly, we vacate the judgment of the district

---

[1] *Cf. Garcia v. Garland*, 64 F.4th 62, 69 (2d Cir. 2023) ("[T]he controlling interpretation of federal law … must be given full retroactive effect in all cases still open on direct review.") (quoting *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993)).

court and remand with instructions to determine whether the investors suffered pecuniary harm as a result of the fraud.

Second, Govil argues that the district court erred when it failed to credit the value of his surrendered securities against the disgorgement award. We agree. A defendant is "only required to give back the proceeds of his securities fraud once." *SEC v. Palmisano*, 135 F.3d 860, 863 (2d Cir. 1998). A wrongdoer makes a payment in satisfaction of disgorgement when he returns property to a wronged party. Govil did that by surrendering his securities to Cemtrex. Accordingly, if the district court determines on remand that disgorgement is authorized, the district court must value the surrendered securities and credit that value against the overall disgorgement award.

## BACKGROUND

### I

In 1998, Govil founded Cemtrex, a "diversified industrial and technology company." J. App'x 10. Even after Cemtrex went public, Govil remained the controlling shareholder of the company, and he served as chairman of the board, chief financial officer, and executive director. Cemtrex's common shares were and are listed on the NASDAQ under the ticker "CETX."

In addition to its common shares, Cemtrex had at all relevant times three classes of preferred stock:

(1) **Series A Preferred** shares did not trade publicly and held voting rights in proportion to the number of outstanding common shares. As of February 2021, each Series A Preferred share was entitled to 16.43 votes. Govil represented in his deposition that the Series A Preferred

5

shares paid no regular dividend. Cemtrex issued 1,000,000 shares of Series A Preferred to Govil in 2009 for consideration, and he held the entire class of Series A Preferred shares until the events underlying this appeal.

(2) **Series C Preferred** shares also do not trade publicly and provide even more powerful voting rights in proportion to the number of outstanding common shares. Assuming 20 million outstanding common shares and 100,000 outstanding Series C Preferred shares, each Series C Preferred share would be entitled to about 2,000 votes in a shareholder election. *See* J. App'x 294-95, 149. Govil also represented that the Series C Preferred shares pay no regular dividend. Cemtrex issued Govil 100,000 shares of Series C Preferred in 2019 as part of his employment agreement, and Govil transferred 50,000 shares to his son, Saagar Govil, in July 2020.

(3) **Series 1 Preferred** shares trade publicly on the NASDAQ under the symbol "CETXP." Each Series 1 Preferred share is entitled to two votes in a shareholder election. And each share pays a "10% annual dividend in perpetuity either in cash or in kind." *Id.* at 295. At the time of the events underlying this appeal, Govil held 469,949 Series 1 Preferred shares.

Because of the outsized voting power of the Series A and Series C Preferred shares, Govil had "control [of] all matters related to Cemtrex," including the "electing of officers and directors, acquisitions [and] direction of business." *Id.* at 294.

With that control, Govil caused Cemtrex to engage in three fraudulent securities offerings in 2016 and 2017. It is undisputed that

6

in connection with all three offerings, Govil, "through Cemtrex, represented to investors that the offering proceeds would be used for various corporate purposes, including new product development and acquisitions, as well as repaying outstanding debt and other general corporate purposes." *Id.* at 11. That representation was fraudulent because after the offerings Govil "knowingly misappropriated at least $7,300,000 of offering proceeds" from Cemtrex by making "at least 21 transfers of offering proceeds from Cemtrex's bank accounts to accounts" in Govil's personal control. *Id.* These diverted funds were used "to pay for personal expenses and to finance [Govil's] other business ventures unrelated to Cemtrex." *Id.* at 11-12.

## II

By early 2021, it had become clear that Govil would be subject both to an SEC enforcement action and to a civil suit by Cemtrex. Govil therefore entered into agreements with both parties.

First, Govil and Cemtrex signed the Settlement in February 2021. By then, Govil had already resigned from the board, leaving three remaining board members, including Govil's son Saagar. An email exchange indicates that the terms of the Settlement were negotiated by board member Sunil Verma. According to the Settlement, the "total amount of disputed transfers was approximately $7,100,000." *Id.* at 175.[2] The Settlement specified that Govil would return those funds through two transfers. In the first

---

[2] That figure differs from the SEC complaint, which alleges that Govil transferred a total of $7.3 million. *See* J. App'x 11. Govil's Consent Agreement states that he cannot challenge the facts alleged in the complaint for purposes of the court's evaluation of disgorgement. *See* Sp. App'x 12. For purposes of this appeal we assume that Govil removed $7.3 million from Cemtrex accounts to his own.

7

transfer, Govil would surrender to the Company any "securities Govil or entities controlled by Govil own in Cemtrex, including 1,000,000 shares of Series A Preferred Stock, 50,000 shares of Series C Preferred Stock, [and] 469,949 shares of Series 1 Preferred Stock." J. App'x 175. Govil was also required to relinquish any options to purchase common stock. Govil and Cemtrex agreed that the surrendered securities would be "collectively valued at the amount of $5,566,720." *Id.* The second transfer was to repay the balance of the $7.1 million—that is, $1,533,280—and would be "paid to Cemtrex by Govil issuing to Cemtrex a secured promissory note." *Id.*

In exchange for the surrendered securities and promissory note, Cemtrex released Govil from all legal claims.[3] On March 4, 2021, Govil surrendered the securities, which Cemtrex's board of directors voted to cancel.

Second, Govil entered into the Consent Agreement with the SEC in April 2021. Govil neither admitted nor denied the allegations in the complaint. But he did consent to the entry of judgment on all counts of securities fraud and the entry of several permanent injunctions and civil fines. *See* Sp. App'x 9-10.[4] The only matters that the Consent Agreement left unresolved were disgorgement, prejudgment interest, and civil penalties with respect to the fraudulent Cemtrex offerings. The Consent Agreement provided that

---

[3] Cemtrex did not release Govil from any claims that might arise out of the promissory note. J. App'x 176.

[4] The SEC's civil complaint states four counts. Only the first count concerns Cemtrex's fraudulent offerings from 2016 and 2017. The other counts concern Govil fraudulently trading Cemtrex stock as well as securities fraud in relation to another Govil company called Telidyne. *See* J. App'x 16-19. Only the first count is relevant to this appeal.

"the parties will either settle th[ose] amount[s]" or "if the parties cannot agree they will have the Court decide whether Defendant shall pay additional disgorgement, prejudgment interest and civil penalty and the amount based on a motion by the [SEC]." Sp. App'x 10. Govil agreed that "solely for purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court." *Id.* at 12.

**III**

In July 2021, the SEC filed its civil complaint against Govil in federal court. A week later, the district court entered a partial judgment consistent with the Consent Agreement. The partial judgment specified that "[u]pon motion of the Commission, the Court shall determine whether it is appropriate to order additional disgorgement of ill-gotten gains and/or a civil penalty" in connection with the count alleging securities fraud arising from the Cemtrex offerings. *Id.* at 6.

The SEC made such a motion in January 2022. Referencing § 78u(d)(5) and § 78u(d)(7) respectively, the SEC argued that "Exchange Act Sections 21(d)(5) and 21(d)(7) authorize courts to order disgorgement in Commission enforcement actions." J. App'x 55. And the SEC pointed out that for purposes of the disgorgement motion Govil was precluded from contesting the allegation that he had diverted approximately $7.3 million. *See id.* at 56. Finally, the SEC represented that it would "make a distribution to harmed investors, if feasible," out of the disgorgement proceeds. *Id.* at 57.

Govil opposed the motion. He argued that the entire value of the Settlement with Cemtrex—$7.1 million—should be credited against any disgorgement award, leaving a maximum appropriate disgorgement amount of about $200,000. *Id.* at 274-75.

The district court resolved the SEC's motion in May 2022. Without specifically citing § 78u(d)(5) or § 78u(d)(7), the district court observed that disgorgement is an equitable remedy, so the amount disgorged "may not exceed the amount obtained through the wrongdoing." *SEC v. Govil*, No. 21-CV-6150, 2022 WL 1639467, at *1 (S.D.N.Y. May 24, 2022) (quoting *SEC v. Wyly*, 56 F. Supp. 3d 394, 403 (S.D.N.Y. 2014)). Were a court to order disgorgement in excess of that amount, the district court explained, the order would amount to a penalty and exceed the court's equitable powers. *Id.*

The district court rejected the SEC's argument that the Settlement was "personal in nature" and for that reason should be excluded from the disgorgement calculation. *Id.* at *2. The "relevant question," according to the district court, was "whether Govil's surrendering of stock and promise of additional payment *to* Cemtrex rights the wrongs to the actual victim of his misconduct." *Id.* In other words, did the payments to Cemtrex already provide a disgorgement remedy to "the person wronged"? *Id.* (quoting *Tilghman v. Proctor*, 125 U.S. 136, 146 (1888)).

The district court answered that question with a qualified yes. The defrauded investors were the "victims of Govil's misconduct" because "[t]hey were promised that the proceeds of the offerings would be used for various corporate purposes" but that promise was a "lie." *Id.* (internal quotation marks omitted). Even so, the district court observed that the defrauded investors "may not have been financially harmed as a result of Govil's misconduct" because they profited on the securities. *Id.* at *4. The promissory note—if paid—would right Govil's wrong because "the funds from the promissory note will presumably be placed in the company's account and used for corporate expenses," such that the "original promise" would be "realized." *Id.* at *3.

10

But the district court concluded that this argument did not apply to the surrendered securities. "[A]fter transferring his control stock to Cemtrex, Govil's son obtained sole voting control over the company, Govil was released from liability, and Cemtrex shareholders received nothing. Only Govil and his son benefitted from Govil's surrender of stock, a result that runs counter to the purposes of disgorgement." *Id.* For that reason, the district court decided that the value of the surrendered stock should not count as a payment satisfying disgorgement.[5] The district court ordered Govil to pay approximately $5.8 million in disgorgement—the total amount requested by the SEC less the face value of the promissory note.[6] Govil appealed.

## STANDARD OF REVIEW

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies and its choice of remedies is reviewable for abuse of discretion." *SEC v. Sourlis*, 851 F.3d 139, 146 (2d Cir. 2016) (internal quotation marks and citation omitted); *see also SEC v. Razmilovic*, 738 F.3d 14, 32 (2d Cir. 2013) ("We review a district court's disgorgement order, and its ancillary findings, for abuse of discretion."). "A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence

---

[5] Given that conclusion, the district court did not reach the question of whether the valuation of the surrendered securities to which the parties agreed in the Settlement was accurate. *Govil*, 2022 WL 1639467, at *3 n.1.

[6] The district court awarded prejudgment interest based on the disgorgement amount. *See Govil*, 2022 WL 1639467, at *3. The district court also ordered Govil to pay a civil penalty of approximately $600,000. *See id.* at *4. Govil did not appeal the penalty, so that decision is not before us.

or rendered a decision that cannot be located within the range of permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (internal quotation marks, alteration, and citation omitted).

## DISCUSSION

Govil raises two principal issues on appeal: (1) whether disgorgement was authorized under § 78u(d)(5) or § 78u(d)(7), and (2) if disgorgement was authorized, whether the district court erred by failing to credit the value of the surrendered securities against the total disgorgement award. We conclude that the district court abused its discretion when it concluded that disgorgement was authorized without finding that the defrauded investors suffered pecuniary harm. We therefore vacate the judgment and remand with instructions to make that predicate finding. Moreover, we conclude that the district court erred when it disregarded the surrendered securities. Thus, if the district court determines on remand that Govil's fraud caused pecuniary harm, the district court must value those securities and reduce the disgorgement award by that value.

## I

Govil's first argument is that disgorgement is not authorized by the Exchange Act because the disgorgement provisions in that statute "require[] a showing that investors have been harmed, and the court did not find that the SEC had made such a showing." Appellant's Br. 31.[7] We agree. As we held in *Ahmed*, both § 78u(d)(5)

---

[7] Govil separately argues that the disgorgement award was invalid under § 78u(d)(5) because the final judgment directs the SEC to forward the disgorgement proceeds to the Treasury, which appears to contradict the Supreme Court's decision in *Liu*. *See* Appellant's Br. 39; 140 S. Ct. at 1948 ("It is an open question whether, and to what extent, that practice [of

and § 78u(d)(7) "must comport with traditional equitable limitations as recognized in *Liu*." *Ahmed*, 72 F.4th at 396. One of those equitable limitations is that disgorgement must be "awarded for victims." *Liu*, 140 S. Ct. at 1940. An investor who suffered no pecuniary harm as a result of the fraud is not a victim. The district court did not find that the investors suffered pecuniary harm. It therefore abused its discretion in concluding that the investors were victims for purposes of disgorgement. Accordingly, we vacate and remand with instructions to make that predicate factual determination.[8]

---

depositing disgorgement funds with the Treasury] nevertheless … is consistent with the limitations of § 78u(d)(5)."). The SEC agrees that the final judgment needs to be corrected. But it says that is because the language in the final judgment is a "clerical error" that arose when the "Commission inadvertently used as a template a proposed final judgment that was created before *Liu* was decided." Appellee's Br. 29-30. In support of that conclusion, the SEC notes that the district court's opinion suggests that it wished disgorgement funds to be directed to investors. *See Govil*, 2022 WL 1639467, at *3 ("The SEC has represented that it is feasible to identify the victims of the fraud. However, if it later determines that distribution to investors is infeasible, it must update the Court to permit consideration of whether directing such proceeds to the Treasury is permissible."). Thus, the parties agree that the judgment must be vacated to the extent that it directs the proceeds of disgorgement to the Treasury. Because we vacate the judgment on another ground, we need not decide whether the language in the final judgment was a clerical error.

[8] Govil argued in the district court that Cemtrex was the victim of his misconduct. *See Govil*, 2022 WL 1639467, at *2. The district court concluded that "the investors are the real victims of Govil's misconduct," *id.* at *3, but it did not directly address the status of Cemtrex. We rely here on the district court's finding with respect to the investors. The district court may also consider whether Cemtrex qualifies as a victim on remand.

**A**

At the outset, we note that Govil's argument that disgorgement is not authorized by the Exchange Act has two parts. He argues first that disgorgement is not authorized under § 78u(d)(5) because that provision authorizes "equitable relief," and *Liu* construed that term to require that disgorgement be disbursed to "victims." He argues second that the district court did not evaluate disgorgement under § 78u(d)(7) and that we should vacate and remand for the district court to perform that analysis in the first instance. These two arguments converge in light of our recent decision in *Ahmed*. *See* 72 F.4th at 395-96. To explain, some background on the development of the disgorgement remedy is necessary.

Disgorgement is a remedy first devised in the 1970s and rooted in the equity power. *See SEC v. Tex. Gulf Sulphur Co.*, 446 F.2d 1301, 1307-08 (2d Cir. 1971) ("[T]he SEC may seek other than injunctive relief in order to effectuate the purposes of the [Exchange] Act, so long as such relief is remedial relief and is not a penalty assessment."); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972) ("[R]equiring the disgorging of proceeds received in connection with the … offering was a proper exercise of the district court's equity powers."); *Liu*, 140 S. Ct. at 1951 (Thomas, J., dissenting) (noting that disgorgement is a "20th-century invention").

Despite its roots in the equity power, however, the disgorgement remedy as it developed in the courts prior to *Liu* "cross[ed] the bounds of traditional equity practice." *Liu*, 140 S. Ct. at 1947. So disgorgement prior to *Liu* was not an entirely equitable remedy, even if it had originated as one. *See also id.* at 1950 (Thomas, J., dissenting) ("[D]isgorgement is not a traditional equitable remedy.").

14

In 2002, Congress enacted § 78u(d)(5). The statute formally gave the SEC the power to request—and federal courts the power to grant—"any equitable relief" in an enforcement action so long as that relief was "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). Confusion emerged fifteen years later when the Supreme Court decided *Kokesh v. SEC*, 581 U.S. 455 (2017). That case presented the question of whether disgorgement generally qualifies as a "penalty" for purposes of the statute of limitations found in 28 U.S.C. § 2462. The Court said yes, but in so holding clouded the legal basis for disgorgement in SEC enforcement actions. "Nothing in this opinion," the Court said, "should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context." *Id.* at 461 n.3. The Court assumed—but did not decide—that our disgorgement jurisprudence dating back to *Texas Gulf Sulphur* was sound. *Id*. at 464.

The Court resolved the confusion three years later in *Liu*. That case presented the question of whether the SEC may seek and federal courts may order "'disgorgement' in the first instance through [the court's] power to award 'equitable relief' under 15 U.S.C. § 78u(d)(5)." *Liu*, 140 S. Ct. at 1940. Construing the phrase "equitable relief," the Court held that "a disgorgement award that [1] does not exceed a wrongdoer's net profits and [2] is awarded for victims" constitutes "equitable relief permissible under § 78u(d)(5)." *Id.* The *Liu* Court observed that the disgorgement jurisprudence of the federal courts of appeals had "test[ed]" the bounds of equity by, among other things, "ordering the proceeds of fraud to be deposited in Treasury funds instead of disbursing them to victims." *Id.* at 1946.

Six months after *Liu*, Congress enacted several amendments to § 78u(d) (hereinafter the "2021 Amendments") as part of the William

15

M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283, § 6501(a)-(b), 134 Stat. 3388, 4625-26 (codified at 15 U.S.C. § 78u(d)(3), (7)-(8)). *See SEC v. Hallam*, 43 F.4th 316, 334-35 (5th Cir. 2022). Most relevant here, Congress enacted § 78u(d)(7), which gives the SEC the power to "seek" and federal courts the power to "order" the remedy of "disgorgement." 15 U.S.C. § 78u(d)(7).

In *Ahmed*, we considered whether § 78u(d)(7) restored our disgorgement framework as it stood prior to *Liu* or instead authorized a remedy consistent with the limitations described in *Liu*. We decided that it did the latter. We held that "*Liu*'s equitable limitations on disgorgement survive the NDAA" and therefore "[w]e read 'disgorgement' in § 78u(d)(7) to refer to equitable disgorgement as recognized in *Liu*." *Ahmed*, 72 F.4th at 395. In short, "disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*." *Id.* at 396. Based on our precedent, disgorgement under both § 78u(d)(5) and § 78u(d)(7) are constrained by *Liu*. For that reason, Govil's suggestion that § 78u(d)(7) might separately authorize disgorgement is foreclosed. "The express addition of 'disgorgement' as a remedy specified under § 78u(d)(7) is … a 'belt and suspenders' clarification that equitable disgorgement is available under the Exchange Act." *Id.* If disgorgement is invalid under one, it is invalid under the other.[9]

---

[9] Section 78u(d)(5) specifies that relief must be "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). But § 78u(d)(7) contains no such language. *Liu* did not squarely address the meaning of "appropriate or necessary for the benefit of investors" in § 78u(d)(5) because it focused on the meaning of "equitable relief." While this language might allow § 78u(d)(5) and § 78u(d)(7) to diverge to some extent, any

16

In announcing the holding in *Ahmed*, we expressly disagreed with the Fifth Circuit's holding in *Hallam*. *See* 72 F.4th at 395 n.7 ("We decline to follow the Fifth Circuit's approach.") (citing *Hallam*, 42 F.4th at 341, 343). *Hallam* held that § 78u(d)(7) "authorizes disgorgement in a legal—not equitable—sense," meaning that disgorgement under § 78u(d)(7) is not limited by the equitable principles recognized in *Liu* but follows the standards the federal courts developed before *Liu*. 42 F.4th at 338.

The Fifth Circuit reached that conclusion based on several familiar principles of statutory interpretation. First, "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *DHS v. MacLean*, 574 U.S. 383, 391 (2015); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section … it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration omitted) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). Here, § 78u(d)(5) refers to "equitable relief." 15 U.S.C. § 78u(d)(5). But § 78u(d)(7) contains no such language. Moreover, § 78u(d)(7) references the remedy of "disgorgement" by name. *Id.* at § 78u(d)(7). Yet § 78u(d)(5) does not mention disgorgement, instead subsuming it under the category of "equitable relief." *Id.* at § 78u(d)(5). Because *Liu* construed the phrase "equitable relief," which does not appear in § 78u(d)(7), the Fifth Circuit concluded that § 78u(d)(7) did not codify *Liu*. *See Hallam*, 42 F.4th at 339.

---

divergence, as we explained in *Ahmed*, is circumscribed by the equitable principles announced in *Liu*.

Second, the canon against surplusage requires that we be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1058 (2019) (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988)). *Liu* was a case about § 78u(d)(5). If § 78u(d)(7) codified *Liu*, then § 78u(d)(7) duplicates one of § 78u(d)(5)'s applications, rendering § 78u(d)(7) superfluous. *See Hallam*, 42 F.4th at 337 (noting that such a reading would "render nearly each new word redundant with the unaltered Section 78u(d)(5)—which had just been held to permit relief going by the same name as the name assigned to the newly added … statutory language").

Third and relatedly, § 78u(d)(7) is a statutory amendment while § 78u(d)(5) is not. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *N.Y. Legal Assistance Grp. v. BIA*, 987 F.3d 207, 221 (2d Cir. 2021) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)); *see also BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 906 (2019) (Gorsuch, J., dissenting) ("[T]he record of *enacted* changes Congress made to the relevant statutory text over time [is] the sort of textual evidence everyone agrees can sometimes shed light on meaning."). If § 78u(d)(7) codified *Liu*, it would mean that Congress amended § 78u(d) in several ways yet did not "alter[] the requirements for the remedy that was the subject of all th[e] revisions." *Hallam*, 42 F.4th at 337.

Fourth, the "structure of the law itself" indicates that § 78u(d)(7) did not merely codify *Liu*. *United States v. Montague*, 67 F.4th 520, 533 (2d Cir. 2023) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019)). As amended, the structure of § 78u(d) distinguishes between disgorgement and equitable remedies. For example, the 2021 Amendments include a new

18

provision, § 78u(d)(8), which outlines several limitations periods for SEC actions.[10] That new provision imposes different limitations periods when the SEC "bring[s] a claim for disgorgement under [§ 78u(d)(7)]," on the one hand, and when the SEC "seek[s] a claim for any equitable remedy," referencing § 78u(d)(5), on the other. *Compare* 15 U.S.C. § 78u(d)(8)(A), *with id.* § 78u(d)(8)(B). That distinction in § 78u(d)(8) indicates that "disgorgement" as authorized in § 78u(d)(7) is not an equitable remedy.

Fifth, we "generally assume[] that, when Congress enacts statutes, it is aware of [the Supreme] Court's relevant precedents." *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1940 (2022). The 2021 Amendments became law less than seven months after the Supreme Court decided *Liu*.[11] "Such swift, expansive action is more consistent with a desire to curtail" *Liu* than to codify it. *Hallam*, 42 F.4th at 341. That is because the *Liu* Court sought to enforce the "limitations embedded in" § 78u(d)(5)'s reference to the equity power, *Liu*, 140 S. Ct at 1947, yet the 2021 Amendments conspicuously distinguish between disgorgement and equity.

In *Ahmed*, however, our court concluded that § 78u(d)(7)'s use of the word disgorgement—along with a cross reference to "unjust enrichment" in § 78u(d)(3)(A)(ii)—refers to a "remedy grounded in equity" and so must "be deemed to contain the limitations upon its

---

[10] In *Ahmed*, we explained that the statute of limitations rubric in § 78u(d)(8) "expressly overrul[ed] *Kokesh*'s five-year statute of limitations as to certain securities violations." *Ahmed*, 72 F.4th at 396.

[11] *Liu* was decided on June 22, 2020. *See* 140 S. Ct. at 1936. The NDAA was adopted on January 1, 2021, when Congress overrode the President's veto.

19

availability that equity typically imposes." *Ahmed*, 72 F.4th at 396 (quoting *Liu*, 140 S. Ct. at 1947).[12]

We also said that § 78u(d)(7) should be read to enact *Liu* because that reading "clarifie[s] some aspects of th[e] uncertainty" about the statute. *Ahmed*, 72 F.4th at 396. We explained that it had been uncertain before *Liu* and the 2021 Amendments whether disgorgement qualified as equitable relief under § 78u(d)(5). *Id.* We further explained that "the applicable statute of limitations" was uncertain before *Kokesh*. *Id.* "[T]he authorization of a ten-year statute of limitations under § 78u(d)(8)(A)(ii) is best understood as expressly overruling *Kokesh*'s five-year statute of limitations as to certain securities violations. So we conclude that disgorgement under § 78u(d)(7) must comport with traditional equitable limitations as recognized in *Liu*." *Id*.

We are bound to apply *Ahmed* in this case. *See Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 100-01 (2d Cir. 2021) ("[G]enerally a decision of a panel of this Court is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court.") (internal quotation marks omitted).[13] Under *Ahmed*, the

---

[12] Whether disgorgement is an equitable remedy is debatable. As noted above, disgorgement as it had developed prior to *Liu* "cross[ed] the bounds of traditional equity practice." *Liu*, 140 S. Ct. at 1947; *see also id.* at 1950 (Thomas, J., dissenting). Whatever the disgorgement remedy entailed, the general rule is that "[w]hen a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (internal quotation marks omitted). Here, that would mean the soil that the *Liu* Court described as crossing the "bounds" of equity.

[13] We note, however, that the circuit split has implications here. Under the *Hallam* rule, § 78u(d)(7) might authorize disgorgement in this case.

disgorgement analysis under § 78u(d)(5) and § 78u(d)(7) are the same in that both depend on *Liu*.

**B**

*Liu* does not authorize disgorgement on these facts, so we vacate the judgment of the district court. Govil's argument proceeds in three steps. First, he says that disgorgement under § 78u(d)(5) must be "equitable relief." That premise is not disputed. Second, the Court in *Liu* explained that disgorgement is "equitable relief" when it "does not exceed a wrongdoer's net profits" and "is awarded for victims." 140 S. Ct. at 1940. This premise, too, is undisputed. Third, the district court's opinion in this case indicated that the proceeds of his disgorgement would be directed to the investors defrauded in the three Cemtrex offerings, *Govil*, 2022 WL 1639467, at *3, yet the district court did not find that those investors suffered pecuniary harm. That means that the investors might not be victims. *See* Appellant's Br. 36. Only this third step is disputed. We agree with Govil's argument and hold that a "victim" for purposes of § 78u(d)(5) is one who suffers pecuniary harm from the securities fraud.

The Supreme Court's opinion in *Liu* did not explain straightforwardly what a "victim" is for the purpose of awarding "equitable relief." But the Court provided guiding principles. For example, the Court explained that a remedy resides in the "heartland of equity" when it "restores the status quo." *Liu*, 140 S. Ct. at 1943

Disgorgement understood as a legal remedy would not be limited by the equitable constraints identified in *Liu*. *Hallam*, 42 F.4th at 338. *Liu* established that disgorgement must be "awarded for victims" to qualify as equitable relief. *Liu*, 140 S. Ct. at 1940. That is our basis for vacating the district court's judgment under § 78u(d)(5). *See infra* Part I.B. That reasoning might not apply to § 78u(d)(7) under the *Hallam* approach.

(alteration omitted) (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987)). If we were to understand "victim" as including defrauded investors who suffered no pecuniary harm—and thus to allow those investors to receive the proceeds of disgorgement—we would not be restoring the status quo for those investors. We would be conferring a windfall on those who received the benefit of the bargain.[14]

That is why the *Liu* Court emphasized that such an equitable remedy is about "*return[ing]* the funds to victims." *Id.* at 1948 (emphasis added). The *return* of funds presupposes pecuniary harm.[15] Funds cannot be returned if there was no deprivation in the first place.

We again see the centrality of pecuniary harm to victimhood when we consider the other profit-stripping remedies that the *Liu* Court discussed: constructive trust and accounting. The Court

---

[14] Disgorgement will rarely reside within the "heartland of equity" as the Court described it. The disgorgement remedy "is not available primarily to compensate victims" but "to prevent wrongdoers from unjustly enriching themselves through violations." *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). Accordingly, disgorgement is calculated by reference to "the amount by which [the defendant] was unjustly enriched." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014) (quoting *FTC v. Bronson Partners*, 654 F.3d 359, 372 (2d Cir. 2011)). In some cases, the fraudster's ill-gotten gains will be less than the harm done to victims, meaning the status quo cannot be restored. In other cases, the ill-gotten gains will exceed the harm, and the victim may recover his loss and more. But by requiring that disgorgement under § 78u(d)(5) be awarded for "victims," the *Liu* Court sought to bring disgorgement within equitable bounds. When disgorgement is awarded to an investor who suffered no pecuniary harm, the remedy does not aim to restore the status quo at all.

[15] *See also* Restatement (Third) of Restitution & Unjust Enrichment § 1 reporter's note d (explaining that the second element of an unjust enrichment claim is "impoverishment" by the plaintiff and the third element is "a relation between the enrichment and the impoverishment").

explained that the constructive trust remedy "converted the wrongdoer, who in many cases was an infringer, into a trustee, as to those profits, for the owner of the [property] which he infringes." *Liu*, 140 S. Ct. at 1944. For example, a patent holder has a legal claim to the profits derived from the patent. When the infringer misappropriates those profits, "compensation [is] due from the infringer to the patentee." *Id.* (quoting *Packet Co. v. Sickles*, 19 Wall. 611, 617-18 (1874)). Prior to bringing an action in equity, the patent holder was deprived of compensation and thereby suffered pecuniary harm.

Similarly, the *Liu* Court noted that an accounting is an "equitable remedy for the violation of strictly legal primary rights," *id.* at 1943 (citing 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 101 (4th ed. 1918)), that "holds the defendant liable for his profits," *id.* (quoting 1 Dan B. Dobbs, Law of Remedies § 4.3(5) (1993)); *see also* Samuel L. Bray, *Fiduciary Remedies*, *in* The Oxford Handbook of Fiduciary Law 449, 452 (Evan J. Criddle et al. eds., 2019) (noting that an accounting "culminates in an award to the plaintiff of the defendant fiduciary's profits"). The plaintiff in an accounting action is entitled to profits as a "beneficiar[y] who [is] entitled to share" in the trust controlled by the fiduciary. *Liu*, 140 S. Ct. at 1944 (quoting *Clews v. Jamieson*, 182 U.S. 461, 480 (1901)). As a beneficiary of the entity controlled by the trustee, the plaintiff has suffered pecuniary harm as a result of the fiduciary's conduct. *See* Bray, *supra*, at 454 ("The profits in question will usually be those generated by the trust, or by whatever resources of the beneficiary are held by the fiduciary.").

The district court concluded that the defrauded investors were victims because "[t]hey were promised that the proceeds of the offerings would be used for various corporate purposes," but this promise was a "lie." *Govil*, 2022 WL 1639467, at *2 (internal quotation

marks omitted). It explained that "[i]t can hardly be said that an individual who invests in a company because he believes his investments are being used to help that company, but whose investment is then used to pay for unrelated expenses, is not the victim of said scheme." *Id.*

On the contrary, we think it can be said. The district court's understanding of the term "victim" may comport with some general dictionary definitions. *See Victim*, Webster's Third New International Dictionary (2002) (noting that a victim is "someone tricked, duped, or subjected to hardship"). But the word has a settled legal meaning. A victim is a "person harmed by a crime, tort, or other wrong." *Victim*, Black's Law Dictionary (11th ed. 2019). The question is whether a fraud that does not cause pecuniary harm nevertheless causes harm of some other relevant type.[16]

---

[16] The district court may have presumed that the investors suffered economic harm by definition when capital that they invested in the company for corporate purposes was looted by an insider. But whether the investors actually suffered pecuniary harm would depend on the type of securities held, the terms of those securities, and when those securities were sold. The record before us does not contain the terms of the securities issued in each of the three fraudulent offerings. However, Govil represented in an affidavit before the district court that the first and third fraudulent offerings involved notes that "could be converted into Cemtrex common shares six months after the notes were issued." J. App'x 295. These convertible notes carried "very high interest rates and an original issue discount," making the notes potentially valuable even before conversion into Cemtrex common shares. *Id.* at 295-96. Moreover, Govil represented in his affidavit that "it is likely" that the institutional investor from the first offering "converted this note into shares in several tranches over a period of time, and sold those shares the day they were converted. If the institutional investor did that, then [the investor] would have earned an approximate profit of $284,061 on

24

In the securities fraud context, it does not. For example, a private damages action for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 requires that the investor have suffered "economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also In re Flag Telecom Holdings, Ltd. Secs. Lit.*, 574 F.3d 29, 35 (2d Cir. 2009). Under common-law deceit and misrepresentation—causes of action that "resemble" a private securities fraud claim, *Dura*, 544 U.S. at 343—pecuniary harm is an element of the claim. *See* Restatement (Second) of Torts § 525 (1977) (explaining that a misrepresentation defendant is "subject to liability to the other in deceit for pecuniary loss caused"). In line with these principles, the investors whom Govil defrauded could not pursue individual fraud claims against him without showing a pecuniary loss. Were we to call those investors "victims" without a similar showing, we would allow the SEC to forward proceeds of disgorgement to such investors and circumvent the limitations on private claims under § 10(b) and the common law.

The Supreme Court has also recently cast doubt—albeit in a different context—on the proposition that mere deception without harm to property rights is sufficient to state a federal fraud claim. In *Ciminelli v. United States*, the Court considered our circuit's "right-to-control" theory of wire-fraud, according to which "the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information

---

its initial investment of $500,000." *Id.* at 296. Govil provides similar calculations for the second and third fraudulent offerings. *See id.* at 296-97. In other words, Govil provides some evidence that the investors in the three fraudulent offerings received the benefit of the bargain. The district court did not engage with this evidence before concluding that the investors qualified as victims.

necessary to make discretionary economic decisions." 143 S. Ct. 1121, 1125 (2023). The Court rejected the right-to-control theory. It reiterated the rule that "the federal fraud statutes … are 'limited in scope to the protection of property rights.'" *Id.* at 1127 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)). And it explained that the "'right to control' is not an interest that had 'long been recognized as property,'" and so was insufficient to establish wire fraud. *Id.* (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).

In this case, the district court's argument for concluding that the investors were victims is not far from the theory rejected in *Ciminelli*. The district court reasoned that it was sufficient that the investors were told a "lie." *Govil*, 2022 WL 1639467, at *2. The investors were thus denied the right to make an informed decision when considering whether to make the investment. But "the right to make informed decisions about the dispositions of one's assets" is not a property interest and offending that right does not result in pecuniary harm. *Ciminelli*, 143 S. Ct. at 1128. The district court did not determine whether the defrauded investors suffered pecuniary harm. In fact, it acknowledged that the defrauded investors "may not have been financially harmed as a result of Govil's misconduct" because the investors received the return on the investment contemplated at the outset. *Govil*, 2022 WL 1639467, at *4.  Because the district court found the investors were victims without determining whether those investors suffered pecuniary harm, the district court "based its ruling on an erroneous view of the law" and thereby abused its discretion. *United States v. Zhong*, 26 F.4th 536, 551 (2d Cir. 2022).

## C

The SEC's counterarguments are unavailing. First, the SEC argues that pecuniary harm is not a prerequisite for disgorgement

under § 78u(d)(5) because there is no requirement to "quantify the dollar value of the harm to particular investors in order to obtain disgorgement." Appellee's Br. 19. The SEC explains that this is because disgorgement is "measured by" the wrongful gain obtained by the defendant rather than by the loss to the investor. That correctly describes how to calculate disgorgement. But this description does not address the separate question of when disgorgement qualifies as "equitable relief" and is authorized by § 78u(d)(5) and § 78u(d)(7) in the first place. As the Supreme Court explained in *Liu*, whether disgorgement is equitable relief turns in part on whether it is "awarded for victims." 140 S. Ct. at 1940. Whether an investor has suffered pecuniary harm—bringing the investor into the category of victims—is a different issue from how to quantify the ill-gotten gains.

Second, the SEC contends that the investors need not have suffered pecuniary harm because the relevant limitation in § 78u(d)(5) is that relief be awarded as "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5); *see* Appellee's Br. 19. The best argument for that position is that Part III.A. of the opinion in *Liu* does not clearly distinguish between the victims of a securities fraud and the investors defrauded, so it might be assumed that a defrauded investor is *ipso facto* a victim of the fraud—whether or not the investor suffered pecuniary harm as a result of the fraud. But that assumption would be inconsistent with the substance of *Liu*. Section 78u(d)(5) imposes two requirements on remedies: the remedy must be "equitable relief" *and* it must be "appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). *Liu* construed the "equitable relief" requirement and said that the requirement is satisfied, as relevant here, when disgorgement is "awarded for victims." *Liu*, 140 S. Ct. at 1940. That means the question of who is a "victim" is distinct from the question of what is "appropriate or

necessary for the benefit of investors" and must be separately answered.

In sum, § 78u(d)(5) and § 78u(d)(7) authorize disgorgement that is "equitable relief." 15 U.S.C. § 78u(d)(5). "Equitable relief" requires that the relief be "awarded for victims," *Liu*, 140 S. Ct. at 1940, and that in turn requires a finding of pecuniary harm. The district court did not make that predicate finding and therefore abused its discretion. We vacate the judgment and remand with instructions to make a factual determination as to pecuniary harm.

## II

Govil's second argument on appeal is that the district court erred in calculating the disgorgement award. He contends that—even accepting that $7.3 million is the correct amount of disgorgement overall—he already "returned a substantial value to Cemtrex when he relinquished all of his shares in the company." Appellant's Br. 47. In other words, Govil maintains that he has already been divested of some amount of his ill-gotten gains and the disgorgement order should be correspondingly reduced. We agree. As a result, if on remand the district court determines that disgorgement is authorized, the district court must undertake a valuation of the surrendered securities and offset the disgorgement award by that amount.

## A

The remedy of disgorgement aims to "force a defendant to give up the amount by which he was unjustly enriched." *Contorinis*, 743 F.3d at 301 (alteration omitted) (quoting *Bronson Partners*, 654 F.3d at 372); *see also Cavanagh*, 445 F.3d at 117 (explaining that the purpose of disgorgement is not "to compensate victims" but "to prevent wrongdoers from unjustly enriching themselves through violations"). For that reason, a defendant need not return more than the amount

28

by which he was unjustly enriched. *See, e.g.*, *Manor Nursing Ctrs.*, 458 F.2d at 1104 (holding that the disgorgement remedy does not reach income derived from the ill-gotten gains because such a remedy would constitute a penalty).

A corollary of that proposition is that each payment in satisfaction of disgorgement offsets the overall disgorgement amount. In other words, "funds returned … are not unjust gains." *Bronson Partners*, 654 F.3d at 369. We have applied this principle in several cases.

For example, in *SEC v. Palmisano*, 135 F.3d 860 (2d Cir. 1998), we confronted circumstances in which a securities fraud produced parallel civil and criminal cases. The civil case resulted in a disgorgement award, and the criminal case resulted in a restitution order. The SEC acknowledged that "payments by [the defendant] to his victims pursuant to the restitution order in the criminal case should be credited toward the disgorgement" because a defendant is "only required to give back the proceeds of his securities fraud once." *Id*. at 863. We endorsed the SEC's position and amended the judgment.

We have also applied the principle when the defendant returned funds prior to litigation. In *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006), we considered a fraudulent telephone service scheme. We explained that the government had not provided a reasonable approximation of the ill-gotten gains because, among other things, one of the companies "gave a one-time credit to any caller who complained … about the [fraudulent] charges" and no evidence "indicate[d] that [the company] refused to provide a credit or refund." *Id*. at 69. The sum fraudulently collected by the telephone

company from customers could not serve as an estimate of the ill-gotten gains because some funds were returned.

We confronted a different set of facts in *Razmilovic* and concluded that the same principle controlled. In that case, we recognized that although a court cannot order disgorgement of income derived from the ill-gotten proceeds, it may "award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits." 738 F.3d at 36 (citing *SEC v. First Jersey*, 101 F.3d 1450, 1474-77 (2d Cir. 1996)). But some of the ill-gotten assets in that case had been "frozen at the behest of the government in connection with the enforcement action," so the fraudster was unable to use those assets, at least for a time. *Id.* We said that "the remedial purpose of prejudgment interest would already have been served with respect to the period of the freeze; to require the defendant to pay prejudgment interest on the entire disgorgement amount including the earlier frozen amount would, for the freeze period, deprive him twice of interest on the portion of the disgorgement award that is satisfied by the frozen assets." *Id.* at 37. We cited *Palmisano* for the proposition that the defendant need pay back the proceeds of his fraud only "once." *Id.*

The principle underlying these cases is that forcing a defendant to pay disgorgement twice amounts to a penalty. *See also SEC v. Fowler*, 440 F. Supp. 3d 284, 296 (S.D.N.Y. 2020) ("[C]ourts should deduct any money that a defendant returns or has returned to her or his victims."); *SEC v. Amerindo Inv. Advisors Inc.*, No. 05-CV-5231, 2014 WL 2112032, at *5 (S.D.N.Y. May 6, 2014) (same). The Supreme Court recognized that proposition in *Liu*. It explained that a wrongdoer "should not profit by his own wrong" but also "should not be punished by paying *more* than a fair compensation to the person wronged." *Liu*, 140 S. Ct. at 1943 (emphasis added) (internal quotation

marks and alteration omitted). Pursuant to this principle, returning value to a wronged party satisfies disgorgement dollar-for-dollar.

In the circumstances of this case, we hold that a wrongdoer returns "value" for the purpose of disgorgement whenever he returns property that holds value in his own hands. That is consistent with our repeated statement that "[d]isgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *Contorinis*, 743 F.3d at 301; *Razmilovic*, 738 F.3d at 36 ("[T]he primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws."); *First Jersey*, 101 F.3d at 1474 (same). Because disgorgement aims to divest profits, not to "compensate victims," *Cavanagh*, 445 F.3d at 117, it does not matter whether the property lacks value in the victim's hands.

**B**

The district court rightly explained that the "relevant question" with respect to the Settlement is "whether Govil's surrendering of stock and promise of additional payment *to* Cemtrex rights the wrongs to the actual victim of his misconduct." *Govil*, 2022 WL 1639467, at *2. The district court erred, however, when it concluded that the securities surrendered to Cemtrex as part of the Settlement did not constitute "fair compensation" to a wronged party. *Id.* (quoting *Tilghman*, 125 U.S. at 146).

The securities surrendered were such compensation. Although some of the shares were of uncertain value, those shares certainly had value in Govil's hands. As part of the Settlement, Govil tendered to Cemtrex 469,949 shares of Series 1 Preferred Stock. As all parties admit, Series 1 Preferred shares trade publicly and are relatively liquid. In principle Govil could have sold his Series 1 Preferred shares

on the open market and tendered the proceeds to Cemtrex, which everyone agrees would be "fair compensation" for the purpose of disgorgement.[17] It is true that, had Govil sold that volume of shares on the market at once, the price would have declined. But the relevant inquiry at this point is not the value of the shares; it is whether the shares had value at all.

That Govil returned property of value in the form of Series 1 Preferred shares is bolstered by the observation that the shares had value *even in Cemtrex's hands*. The Cemtrex board canceled those shares, but it did not need to do so. Cemtrex could have traded the shares for consideration. And even if Cemtrex simply held or canceled the shares, Cemtrex still would have received value because the 10 percent dividend on the Series 1 Preferred shares would not be payable when the shares were no longer outstanding. In sum, the Series 1 Preferred shares had value even in Cemtrex's hands. That supports the conclusion Govil was stripped of ill-gotten gains when he relinquished his interest in the Series 1 Preferred shares.

The Settlement also specified that Govil would return his Series A Preferred and Series C Preferred shares. While those shares did not trade publicly or pay a regular dividend, the shares nevertheless had value in Govil's hands. The principal benefit of the Series A Preferred and Series C Preferred shares is that the shares enabled the holder to control Cemtrex. Control of a company—even without a claim to the company's retained earnings—has value. That is why a "control

---

[17] At the time Govil negotiated the Settlement with Verma, Series 1 Preferred shares traded at around $1.80 per share on the NASDAQ. Using that figure, Govil's interest in the Series 1 Preferred shares could have generated about $850,000—a substantial amount by which the disgorgement award could have been reduced.

premium" is often added to the valuation of shares that control a company. *See Lippe v. Bairnco Corp.*, 99 F. App'x 274, 278 (2d Cir. 2004) ("[T]he addition of control premiums is a standard valuation technique."). Indeed, the appraiser in this case added a control premium when valuing the Series A Preferred and Series C Preferred shares. *See* J. App'x 245-46. While the accuracy of that valuation is a matter for the district court on remand, *see infra* note 19, we cannot say based on the record before us that the control that came along with Govil's interest in those preferred shares was without value. We conclude that Govil gave compensation as part of the Settlement.

The only remaining question is whether surrender of the securities to Cemtrex constitutes a return to the "person wronged." *Tilghman*, 125 U.S. at 146. The district court concluded that "the investors [were] victims of Govil's misconduct." *Govil*, 2022 WL 1639467, at *2. It declined to say whether Cemtrex itself was a wronged party. The district court explained that the stock surrender did not provide value to the investors, so the stock surrender should not count against Govil's disgorgement amount. That conclusion was erroneous.

Even if the district court were correct that only the investors—not Cemtrex—were harmed,[18] the Settlement nevertheless constituted compensation to the wronged party. As we have explained, the surrendered securities had value. When Govil surrendered the securities, the value of the securities was transferred to Cemtrex and thereby benefited Cemtrex investors. The district court embraced this theory as it applied to the promissory note and

---

[18] Because the investors were harmed by the company being deprived of the benefit of the investment funds, *see Govil*, 2022 WL 1639467, at *2, it is difficult to see how the investors but not the company were harmed.

33

credited the note's value against the overall disgorgement amount. In so doing, the district court explained that "the funds from the promissory note will presumably be placed in [Cemtrex's] account and used for corporate expenses, [so] the original promise to the purchasers of the offerings will, in fact, be realized." *Govil*, 2022 WL 1639467, at *3. That argument applies with equal force to the surrendered securities. The defrauded investors enjoyed the benefit of value transferred to the company in the same way that they enjoyed the benefit of the funds promised by the note.

We conclude that the district court erred in deciding not to offset the disgorgement award by the value of the surrendered securities. If the district court determines that the defrauded investors suffered pecuniary harm, which would mean that disgorgement is authorized, the district court must value the surrendered securities and credit the value against the disgorgement award.[19]

## C

The SEC makes three counterarguments, but we are not persuaded.

First, the SEC argues that the stock surrender "did not provide capital to Cemtrex that could be used to pay corporate expenses" as opposed to the promissory note, which did provide capital. Appellee's Br. 25. We see no reason for requiring that disgorgement be satisfied in cash. To the contrary, our case law appears to recognize that disgorgement may be satisfied through the transfer of non-cash

---

[19] Because the district court declined to recognize the securities surrender at all, it did not address the value of the securities. *See Govil*, 2022 WL 1639467, at *3 n.1 (noting that the district court "declines to address the SEC's argument that the valuation of the preferred stock is not credible"). The district court should address that issue in the first instance.

assets.[20] In any event, disgorgement aims to divest the wrongdoer of ill-gotten gains; it is "unlike an award of damages" that aims to *compensate* a victim, so it is irrelevant that the wronged party receives value in an illiquid or disfavored form. *First Jersey*, 101 F.3d at 1475. What matters is that the wrongdoer returns the unjustly obtained value.

Second, the SEC maintains that the surrender should not offset the disgorgement award because "a defendant is not entitled to a deduction simply because he has already dissipated his ill-gotten gains for his own benefit." Appellee's Br. 24. This repeats an argument that the SEC made before the district court: The Settlement should not offset the disgorgement award because it is a personal expense, not a business expense.[21] The argument fails because it confuses deductions for business expenses (as opposed to personal expenses) with payments in satisfaction of disgorgement. Disgorgement is limited to a defendant's "net gains." Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. h. In

---

[20] *See SEC v. Levine*, 881 F.2d 1165, 1173 (2d Cir. 1989) ("[V]irtually all of the disgorged assets were earmarked for defrauded investors."); *Bronson Partners*, 654 F.3d at 371 ("[A] court confronted with a private, equitable claim sounding in unjust enrichment may ordinarily award only a constructive trust or an equitable lien, because only those remedies require the district court to find that the defendant holds specific property that is traceable to the proceeds of his wrongdoing."); *Contorinis*, 743 F.3d at 305 (discussing the "well-established principle in disgorgement law" that "the court may only exercise its equitable power only over property causally related to the wrongdoing").

[21] *See Govil*, 2022 WL 1639467, at *2 ("The SEC first argues that the disgorgement should not be reduced … because the payments via the Settlement Agreement were 'personal in nature' and should not be treated as business expenses that can be deducted from the disgorgement.").

calculating this gain, a defendant is "entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement," *id.*, which does not include personal expenses. But a deduction made to calculate the net gains subject to disgorgement is not the same thing as a deduction to offset a payment already made in satisfaction of disgorgement. We agree with the district court both that the Settlement cannot be considered "strictly 'personal in nature' simply because Cemtrex released Govil from liability in exchange for the repayment" and that the "relevant question" is not the business character of the payment but "whether Govil's surrendering of stock and promise of additional payment *to* Cemtrex rights the wrongs to the actual victim of his misconduct." *Govil*, 2022 WL 1639467, at *2.

Third, the SEC argues that only Govil and his son "received significant benefits in return for his relinquishment of shares because [Govil] was able to transfer control of the company to his son while obtaining a release from liability." Appellee's Br. 26; *see also Govil*, 2022 WL 1639467, at *3 ("[A]fter transferring his control stock to Cemtrex, Govil's son obtained sole voting control over the company, Govil was released from liability, and Cemtrex shareholders received nothing."). The SEC encourages us to make an exception to the general rule about returning value to harmed parties because "[p]ermitting Govil to claim that value as a deduction would allow him to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving the proceeds to friends and relatives." Appellee's Br. 26 (internal quotation marks and alteration omitted).

We are not persuaded. Although disgorgement amounts are neither "foreclosed nor confined by" a settlement agreement, we have held that "[a] settlement payment may properly … be taken into account by the court in calculating the amount to be disgorged." *First Jersey*, 101 F.3d at 1475. All settlements confer a benefit on the parties,

so our statement in *First Jersey* indicates that such benefits do not preclude a settlement payment from satisfying disgorgement. Moreover, Govil's son gained control only because he was a shareholder in his own right. And that result does not change the fact that the surrendered securities have value and that wronged parties benefited from the surrender.[22] We do not agree with the SEC that the normal rules applicable to disgorgement should recede based on an evaluation of the personal relationships between defendants and the shareholders who end up in control of the company.

## CONCLUSION

The district court abused its discretion by ordering disgorgement without finding that the defrauded investors suffered pecuniary harm. We vacate the judgment of the district court and remand with instructions to make that factual determination. If the district court concludes that the fraud caused pecuniary harm such that disgorgement is authorized, the district court must value the surrendered securities and credit that value against the overall disgorgement award.

---

[22] Govil's son controls Cemtrex because he holds all of the currently outstanding Series C Preferred shares. Govil's son obtained those shares as a gift from Govil. *See* J. App'x 149. The SEC's argument that Govil is "circumvent[ing] the SEC's power to recapture fraud proceeds, by the simple procedure of giving the proceeds to friends and relatives" would have force if Govil had sought to deduct the value of the shares given to his son. Appellee's Br. 26. But Govil has not made that argument. Nor could he. Such a transfer would be valuable, but it would not be value returned to a wronged party—and for that reason it would not warrant an offset of the disgorgement award.